And at this time, we'll hear Love N' Care, Ltd. v. Goldberg-Cohen. Thank you. Good morning. Good morning. Thank you, Judge Jacobs. As you know, this case comes before the court on our appeal of the district court's dismissal of all five counts of an action for legal malpractice brought by a Louisiana corporation and its affiliate, Delaware Corporation. I want to spend my time with you this morning focusing primarily on two of those specific counts because I think I can be helpful to the court in explaining exactly why we think the district court, in effect, assumed away and presumed away the critical factual disputes that relate to both of those counts. Let me briefly, if I may, first of all say that we've obviously briefed at length the issue of the applicability and interpretation of the New York borrowing statute, but for purposes of today's argument, I'm going to assume solely for purposes of this argument that Louisiana law does apply, and I'm going to address myself to that. If you assume it for the purposes of this argument, there aren't going to be too many other purposes. Well, we'd like to . . . we just submit that on the briefs. We fully briefed it, and we think our position on that is clear. It's essentially an issue that's never been resolved by this court or the New York Court of Appeals, and so we submit that on the brief, and we'd like to focus, if we can, on the . . . Application of . . . . . . of Louisiana law. That's correct. So, let me say, Judge Jacobs, first of all, I think it's important to understand the lens through which the court must view the dismissal of these five counts. And it's, if you will, it's a kind of a hybrid of Rule 12 law, with which this court is, of course, closely familiar. This court has said in the Bice case and the Baino case that, if you will, you do not dismiss under Rule 12 on limitations grounds without giving the defendant . . . excuse me . . . the plaintiff a fair shot at showing that there are factual disputes that relate to the limitations defenses. But counsel arguably conceded with respect to counts 2, 4, and 5. So, you're going to focus, I take it . . . As you know, our position is it's very debatable whether we conceded anything in the framework of the ambiguous cross-examination that took place at the hearing on the motion to dismiss. But, again, I'm going to address myself to counts 1 and 3, which by no stretch of the imagination were conceded, Your Honor. Go ahead. So, the second, if you will, the second prong, if you will, the second lens through which this matter must be viewed is the applicable Louisiana law of prescription and preemption. And, as you know, it's well established that under the borrowing statute, when you borrow a foreign statute of limitations, you borrow it lock, stock, and barrel. You don't just borrow the limitations period. You borrow tolling doctrines, suspension doctrines, and in the case of Louisiana, you borrow the steep uphill climb that any defendant must achieve in order to achieve dismissal of a complaint without a factual hearing. Actually, virtually all proceedings of this kind in Louisiana, which are called an exception of prescription, are resolved only after a trial, an evidentiary hearing. And if the court looks at essentially all of the cases that are cited on both sides, you will see that there's been an evidentiary hearing to determine whether or not the facts justify a ruling, if you will. What if it just boils down to two facts, which is that by April 2012, there was a requirement to identify any additional product lines, and it wasn't done then. And it was more than three years later that it was beyond the statute of repose. Well, I think that's a very good example, Judge Jacobs, for the following reason. And that is that we don't know, as we stand here today, whether that was a hard discovery cutoff, whether or not there were subsequent discussions and events between counsel for my client and counsel for the lawyers who are defendants in this case, to simply identify one opportunity, if you will, on which there may have been some act or omission of malpractice doesn't in any way obviate an inquiry into all of the subsequent events that took place with respect to this count one, which is what you're referring to. But surely when a judge sets a deadline, lawyers are supposed to do things by that deadline. I mean- Well, in this particular case, there were in fact- If you miss a deadline, your hearing is not going to be very satisfactory. Your Honor, if you look at Mr. Guerrero's affidavit that was submitted in opposition to the motion to dismiss the amended complaint, you'll see that there are multiple factual issues relating to the communications between outside counsel and inside counsel, what outside counsel told inside counsel. And in fact, there are also multiple factual issues relating to the time when our client and counsel discovered that this particular product was in play, if you will. Again, the court simply assumed that away. Yes, that's right. In other words, there is a serious factual issue as to when the offending product emerged in the litigation and the timing of the failure to include that in the lawsuit. Could you say that again with specifics and dates? Yes. Your Honor, the lawsuit was filed, as I recall, in 2010. Shortly after the lawsuit was filed, it is undisputed that our client withdrew the complaint relating to the so-called Explora line because it had been advised by opposing counsel that the particular line of products did not include the patented valve in question. For the SIPECA. Correct. Later, later in the progression of events, and again, the time when it emerged and who knew what are factual issues that remain to be resolved, which are hotly disputed between both sides as the record reveals. Later it emerged that that cup indeed incorporated the offending valve. And the issue with respect to this count one is whether these defendants properly included that product line once everyone involved became aware that that particular patented valve was in fact included contrary to what had been thought when it was initially dropped from the litigation. And when was that? I think it's unclear from the record at this point because the record has never been developed on the point. The case was dismissed on a Rule 12 motion. I don't think it's clear when the . . . now, you know, there are contentions that it emerged in the course of an expert deposition in the case. But again, that's a factual issue that hadn't been resolved. There was such an expert deposition. There was. And it emerged. I mean, it surfaced in that deposition. Or putting it another way, it was identified. Maybe for the first time, maybe not, in it. Your Honor, let me, if I may, sort of again bring count three into the discussion for just a minute. Could you just tell us when the expert deposition took place? Sure. You've reserved rebuttal, so we can check that out later. But you were going to go on to count three. The critical issue, the critical factual issue that the court assumed and presumed away, Your Honor, is exactly what the communications were between these parties. The court said, well, you had inside counsel who was an experienced lawyer. And the court said, well, this particular pleading was filed on a particular date, and it surely put you on notice that there had been a malpractice. Well, the critical contention that my client makes, and it's been alleged in many different ways in this record, is that they were told repeatedly by their counsel that these problems could be fixed, that the Explorer line could be fixed by a subsequent lawsuit, and that the attorney's fee bungle, if you will, could be fixed. In fact, these attorneys filed an opposition, a reply, if you will, in April of 2014 to the Royal King opposition to attorney's fees, in which they said there was nothing wrong with the filing, that it was timely, the presentment had been made, that an estimate had been given to the other side, and nothing changed. There's nothing, not a word in this record to suggest that after that motion was filed by the defendants in this case, that they ever communicated anything to the plaintiff that suggested that there was a problem with the motion. In fact, if you look at page 49 of their brief, they are contending to this day that there was nothing wrong with that filing. The question is how could my clients be put on notice to file a malpractice case against these defendants when the defendants were contending at all times that they'd done nothing wrong? In a malpractice case, you'll always have that. I didn't do anything wrong, but if I did, it's barred by the statute of limitations. It's the second one that we're looking at here. If there was a failure to give notice, it was in 2010 when the lawsuit was filed, because the notice was required under Louisiana law . . . Texas law, actually. Texas law to be given before you initiate suit. It makes perfect sense. I don't think that's . . . If you dilute 2010 and 2015, I think you're more than three years. What's wrong with my arithmetic? Well, first of all, I don't think it's at all clear that the 2010 deadline, that the filing of the lawsuit is the cutoff point under Texas law for making presentment of a demand for attorney's fees. In fact, that's exactly what my colleagues here argued in their opposition . . . in their reply to the opposition to attorney's fees. They argue that we're perfectly timely in making presentment when we did. Everybody argues every which side of everything. The question is . . . Can I address, really, I think, again, the key point is . . . Yes, it's true, perhaps, that in malpractice cases, we often have . . . let us call it a warning bell of malpractice at the same time as parties are continuing to allege that their position is well founded. The difference is that if you look at the Louisiana cases, they do not resolve as a matter of law . . . excuse me, without an evidentiary hearing, as was done here. That particular combination of facts, the cases in Louisiana that resolve these matters on exceptions, typically do so when there's been an admission of a mistake. The lawyer contacts the client and says, I made a mistake. Or, there's a document that shows unequivocally . . . That happens?  Yes, it does. Yes, absolutely. That doesn't happen in New York. Well, in any event, it happens. And, again, the point is the framework in Louisiana, which was fundamentally misunderstood by the district court, is one that says, you do not dismiss these kinds of issues on a naked pleading. You've reserved a couple of minutes for rebuttal, Mr. Weiss. Yes. We'll hear you then. Thank you. Mr. Cohen. Good morning, Your Honor. May it please the Court. I'd like to address first just the background, just very quickly. And, it's important to keep in mind the context. Goldberg-Cohen won four trials in a row for LNC. In one of those cases, LNC was seeking $8.4 million. Goldberg-Cohen secured a jury verdict of $10 million, more than they were even asking for. Well, if you're going to argue the clients are ungrateful, you carry the day. Thank you. Not the issue. Thank you. Then, moving now to the merits. As Your Honor had mentioned, they conceded counts 2, 4, and 5 at the district court level. The remaining counts are counts 1 and 3. As Your Honor noted, the cutoff for the Jackal case amendment was April of 2012. Under the Louisiana statute, they are more than three years from the absolute bar. Where do we look to see whether that cutoff was either absolute or not extended? Nothing in the record at the district court level in the Jackal case suggests that it was ever extended. And, furthermore, at trial, they're arguing it wasn't presented. That trial date is also outside the statute of limitations. That trial date was in January of 2013, also outside the statute of limitations of Louisiana. So, even assuming that they could have gotten an extension, the extension would have been after trial. Clearly, at trial, it would have had to have been presented. It wasn't presented. And, as a result, the alleged error is way outside the statute of limitations. With respect to the- Do you concede that there was an error? No, we- It's a matter of curiosity. No, we don't. In fact, in a related case, Love and Care has itself conceded that they did the error. In the case that they filed against Jackal in Texas, their in-house counsel told the court that they made a mistake. That was before we were ever involved in the case. The record reflects that the error, if there was one, was their deliberate, voluntarily decision. We didn't make that decision. We abided by their determination of what they had disclosed to Jackal and what they considered to be a disclosure. With respect to the second issue, with respect to Royal King, that also is far outside the statute of limitations. As Your Honor noted, presentment was required by November of 2010. This case was filed in 2015. The three-year absolute deadline would have been 2013 at the very latest. They raised this issue in their complaint- Let me ask you this. This is a different lawsuit than any of the others, right? I'm sorry, the Royal King case? Yes. Yes, correct. So why couldn't they have just started another lawsuit? Against Royal King or against us? Against you. They would have had to file a lawsuit against us within three years of the error, which would have been between 2010 and 2013. Okay. And in addition to that, in addition to the fact that the presentment error, which was an error that was beyond the deadline, this error was also raised in briefs by Royal King, the alleged error, because it wasn't. But even assuming their version of the facts, the alleged error was raised by Royal King in briefs that it filed in April of 2014. Not only were they fully aware of those briefs, not only were they fully aware of the issue, their in-house counsel submitted a declaration in opposition, arguing against Royal King's position. He was aware of the issue, and he argued against it. That's in the record at A338. Mr. Guerrero at A338 is arguing against the particular arguments that Royal King is making. So at the very latest, in April of 2014, Love and Care is aware of these arguments, these allegations- Okay. This is the April 7, 2014 date. They're aware that attorney's fees are being opposed. That is correct. And they're aware that the Royal King defendants are saying that it's untimely to get attorney's fees. Right. But what about your adversary's argument that they're entitled to-they don't really know what the judge is going to do until March of 2015? Well, there are two issues there. One is that at this point, the condition precedent of presentment is already gone. That's three years. In addition, the standard under Louisiana law is whether they're on constructive notice. It is enough to form inquiry. They're more than constructive notice. They have actual notice there's a potential issue that a date was missed. We take the position the date was not missed because of the fact that under Texas, under Fifth Circuit law, as set forth at A331 of the appendix, the deadline is within 14 days of a final judgment. As of that time, there was no final judgment, so we were timely. In fact, I checked the record in the Texas case yesterday. As of yesterday, there's still no final judgment. We technically could file a motion for attorney's fees today. It would not be untimely. But in any event, even assuming the worst-case scenario, even assuming their position, which is contrary to the law as set forth on A331, they were on inquiry notice of these issues in April of 2014. They had one year to raise this before a court in a lawsuit in Louisiana. They were here and they did not do so. They're way beyond their statute of limitations. Those were the two issues in terms of count one and count three. If there are any other issues that Your Honors would like me to address, I'm happy to do so, but those are the only two that they raised. I know accrual, maybe if I can just say quickly, the accrual issue, Louisiana law, I think it's clear under global finance and under the other case law that these claims accrued in Louisiana. It's clear that they conceded at the district court level that under Louisiana law they were untimely for one, two, and five. They conceded that for counts one and three, the facts that we mentioned, the April 2012 deadline and so forth. In addition, with respect to the various particular facts, they conceded that we fall under Louisiana statute 95605, which provides the deadlines that I indicated. Likewise, with respect to accrual, global finance is very clear as to the law with regard to accrual. Our briefs are clear on it as well. Where a plaintiff first, at the time and place a plaintiff could have first brought suit, the claim is accrued. There is no dispute here that they could have sued us in Louisiana if they had won it within their deadlines. And that's why the global finance case chooses residents to make it a clear indication, certain to uniformity, as opposed to grouping of contacts and so forth that they try to use here, that the court rejected in the global finance case. If there are any further questions, I'm happy to address them. Thank you. Thank you, Your Honor. Mr. Weiss. Thank you. Thank you. First of all, the deposition date was in June of 2011. Again, however, who said what to who and what reassurances we received from counsel about whether the product should be included or shouldn't be included, you know, these are factual issues that have never been developed in this record. Let me go, if I may. First of all, I want to mention that the application of the Louisiana so-called preemption statute for legal malpractice, 95605, I think the district court's application of that statute, given the plain wording of the statute, giving the overwhelming Louisiana authority to the contrary, frankly, I think it was plainly erroneous. It's as simple as that. That statute does not apply here. This tortured construction of the statute . . . Do you think it only protects Louisiana lawyers admitted in Louisiana? I think it protects lawyers duly admitted in Louisiana, whether nonresident or Louisiana. How about pro hack vice? Yes, it applies to pro hack vice. I agree with that as well. That would be as to count one. That's correct. You say it doesn't apply as to their other counts. That's correct. And, again, I think Louisiana law is clear on that. We cite the Trans-Pacific case, Your Honor, which is a case in which squarely, a Louisiana appellate case which squarely refuses to apply that statute to individual lawyers. Whatever can be said about whether it applies to the defendant's entity, there's absolutely no authority suggesting that the statute applies to individual attorneys other than the district court's simple one-line assertion that it does. Period. End of story. So I want to make that point clear. And it makes a difference in the case not only with respect to the applicability of the three-year period that the court has questioned me about. It also could make a very big difference in these defendants' pending action to recover their fees that's pending before the judge. Mr. Judge, is a lawyer authorized to practice law in Louisiana? Am I correct? Yes. That's correct. Are you saying that the defendant law firm practiced law in Louisiana without authority? Yes. I'm saying that it failed to undertake the provisions provided by Louisiana law for the qualification of a foreign entity and or law firm to practice law in Louisiana, that not unauthorized in this case does not mean authorized. One Louisiana court has held the Evans case has held that to be the case. What do you mean by not unauthorized does not mean authorized? Well, essentially . . . If it's not unauthorized, then it's a double negative, then they're authorized. Not necessarily within the meaning of the statute. Authorized, we contend, within the meaning of the statute, means that they jumped through the required legal hoops to become authorized to practice law in Louisiana on an ongoing affirmative basis as, for example, as we say in our brief, the Proskauer firm and many other out-of-state law firms have done exactly that. They didn't do it. But, again, the point, Your Honor, is even if they did do it, the statute by its plain terms doesn't apply to any individual lawyer who is not, quote, duly admitted to the practice of law in Louisiana. By the way, it also doesn't apply to partnerships who are . . . unless they are comprised of duly admitted lawyers. So everybody has to be duly admitted in Louisiana for it to apply? To receive the advantage of this particular unusual statute. Otherwise, general principles of Louisiana prescription apply. Let me, if I may, conclude with what I think is, again, the critical point. It may be the case in some jurisdictions, including New York, that receipt of bad news in a lawsuit is enough to begin the limitations period running in terms of legal malpractice. That is distinctly not the law in Louisiana. The Teague case in particular, Louisiana Supreme Court case, and other cases we cite, say that the potential legal malpractice plaintiff must not only have received, if you will, a bad result, it must have been appreciably damaged, and it must reasonably be able to connect the bad result with legal malpractice. And, again, just using count three as an example. What in this record conceivably suggests that as of April of 2014, when Royal King was opposing attorneys' fees and our attorneys were saying that their opposition was groundless, what connected it to malpractice? Nothing. The Scranton case, which we cite in our brief, is a very good example of that. In the Scranton case, there was a failure, if you will, by an attorney to properly protect his client's rights with respect to a mineral lease. And he kept telling them everything was okay, which is exactly what we contend was the case here. Thank you. Thank you both. Thank you, Your Honor. We'll consider a decision.